## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:04-CR-62-TS |
| | ) | |
| CHRISTOPHER WABOL | ) | |


### OPINION AND ORDER

On November 8, 2006, this Court found the Defendant, Christopher Wabol, not guilty

only by reason of insanity. This matter is now before the Court for determination and disposition

after a hearing regarding his release or hospitalization. The government maintains that the

Defendant should be committed for further treatment. The Defendant argues that he is entitled to

be released. For the reasons stated in this Opinion, the Defendant is committed to the custody of

the Attorney General.


### BACKGROUND

The Defendant was indicted in the Northern District of Indiana, South Bend Division, for

making threatening interstate communications in violation of 18 U.S.C. § 875(c). The Defendant

was subsequently evaluated pursuant to 18 U.S.C. §§ 4241, 4242 and 4247 to determine both

whether he was insane at the time of the offense charged and whether he was suffering from a

mental disease or defect rendering him mentally incompetent to properly assist in his defense

and stand trial.

On September 26, 2006, the Court determined that the Defendant was competent to stand

trial. This finding was supported by a report prepared by Dr. Robert Cochrane on September 11,

2006. On October 23, 2006, the Court conducted a bench trial at the Butner Medical Center,

Butner, North Carolina. On November 8, 2006, the Court entered a Special Verdict of Not Guilty

Only by Reason of Insanity on the charge that the Defendant made interstate threatening

communications. The Court found that the Defendant made telephone calls to his mother's

phone number that contained threats to injure her and the threats were made in the context and

under such circumstances that a reasonable person would foresee that the statements would be

interpreted by the person receiving the communication as a serious expression of an intention to

inflict bodily injury. The Court also found that Dr. Cochrane, through his forensic report dated

September 11, 2006, and his testimony on October 23, 2006, provided sufficient evidence for the

Court to find by clear and convincing evidence that the Defendant, at the time of the offense, was

suffering from a severe mental disorder (Schizoaffective Disorder, Bipolar Type) and was

laboring under delusions such that he was unable to appreciate the nature and quality, or the

wrongfulness, of his conduct.

After entering the Special Verdict, the Court ordered Dr. Robert Cochrane to conduct an

examination of the Defendant pursuant to 18 U.S.C. § 4243(b) to determine whether he is

"suffering from a mental disease or defect as a result of which his release would create a

substantial risk of bodily injury to another person or serious damage to the property of another."

*See* 18 U.S.C. § 4247(c)(4)(C) (setting forth contents of reports ordered under § 4243). Dr.

Cochrane completed his risk assessment report on December 4, 2006, setting forth his own

opinion (with input from other members of the staff who observed the Defendant) and a Risk

Assessment Panel's opinion that the Defendant's release would create a substantial risk of bodily

injury to another person or serious damage to the property of another due to his mental illness.

2

*See* Report at 17.

On December 15, 2006, the Court conducted a hearing pursuant to 18 U.S.C. §§ 4243(c) and 4247(d) to determine whether the Defendant should be released from custody or committed to the custody of the Attorney General. The Court admitted Dr. Cochrane's December 4 risk assessment report as a hearing exhibit. The Court also heard testimony from Dr. Cochrane and Mary Kay Kinsella, the Defendant's mother and the person to whom he directed his threatening communications. The admissibility of evidence was not limited by the Federal Rules of Evidence. *See United States v. Palesky*, 855 F.2d 34, 36 (1st Cir. 1988) (holding that exception created by Federal Rule of Evidence 1101(d)(3) for "proceedings with respect to release on bail or otherwise" applied to hearing under § 4243).


## DISCUSSION

### A.    Burden of Proof

After a defendant has been found not guilty only by reason of insanity, an inference of continued mental illness and dangerousness remains that justifies the acquitee's commitment for treatment. *Jones v. Unites States*, 436 U.S. 354, 366 (1983). "It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Id.; see also id.* at 363 (observing that a verdict of not guilty by reason of insanity establishes two facts: "(i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness").

However, such an inference does not last indefinitely. *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992). An insanity acquittee "may be held as long as he is both mentally ill and dangerous,

but no longer." *Id.* However, it is the defendant who bears the burden of proving he can be safely

released. 18 U.S.C. § 4243(d). This burden varies according to the nature of the crime:

> [A] person found not guilty only by reason of insanity of an offense involving
> bodily injury to, or serious damage to the property of, another person, or
> involving a substantial risk of such injury or damage, has the burden of proving
> by clear and convincing evidence that his release would not create a substantial
> risk of bodily injury to another person or serious damage of property of another
> due to a present mental disease or defect. With respect to any other offense, the
> person has the burden of such proof by a preponderance of the evidence.

*Id.* § 4243(d).

In this case, the government and the Defendant agreed on the hearing record that the clear

and convincing standard applies. In its Special Verdict, the Court found that the Defendant

transmitted an interstate communication that contained a "true threat." A true threat is a

statement that came "in a context or under such circumstances wherein a reasonable person

would foresee that the statement would be interpreted by those to whom the maker

communicates the statement as a serious expression of an intention to inflict bodily harm upon or

take the life of [another individual]" *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir.  2005)

(quoting *United States v. Hoffman*, 806 F.2d 1569, 1570 (7th Cir. 1990) as cited in *United States*

*v. Khorrami*, 895 F.2d. 1186, 1192 (7th Cir. 1990)) (brackets in original).  To obtain a conviction

on the charge, the government did not have to prove that the defendant subjectively intended for

the recipient to understand the communication as a threat nor did the government have to prove

that the defendant actually intended to carry out the threat. *Stewart*, 411 F.3d. at 828.

In the telephone messages the Defendant left for his mother, Mary Kay Kinsella, who he

believed was an imposter and not his real mother, the Defendant threatened to come to her house

and kill her. There is no evidence to indicate that the Defendant took steps to carry out his threat.

It is clear that his offense did not involve bodily injury or serious damage to property. Whether the Defendant's threatening messages involved a substantial risk of such injury or damage is a closer call. However, this Court need not make the difficult determination whether a substantial risk of bodily injury or serious damage to property is inherent in the kind of threat the Defendant was charged with making, *see United States v. Gilgert*, 314 F.3d 506, 515 (10th Cir. 2002) (stating that "uniqueness" of the crime of making a threat against the president, which was "qualitatively different from a threat against a private citizen or other public official" allowed it to "formulate a rule without entering into the thicket of the debate on the classification of threats in general"); regardless of which standard is used, the Defendant has failed to meet his burden.

**B.       Dr. Cochrane's Risk Assessment Report**

Dr. Cochrane, in preparation for his report, reviewed collateral information including the Defendant's medical health records, conducted clinical interviews, and evaluated the Defendant under the Hare Pshychopathy Checklist-R, 2nd Edition, the HRC-20, and the Violence Risk Appraisal Guide. The report also contains the findings of a Risk Assessment Panel, which was comprised of the acting Chief of Psychology and three other members of the Butner staff.

The report notes that since being on a regimen of olanzapine, the Defendant has been behaviorally stable, with no descriptions of him engaging in bizarre, aggressive, or self-destructive behavior. However, the dosage is too low to have much impact on his delusions. (Report at 7) (The Defendant "continues to suffer from Schizoaffective disorder and to harbor delusional thoughts concerning the FBI and his mother").

The Defendant continues to express "considerable anger over what he believes is ongoing

harassment and mistreatment toward him." (Report at 6.) He continues to believe that "he was once the subject of an Italian mafia hit, a hit was later placed on his mother, and his mother has been working with the CIA and an imposter has been put in her place." (Report at 6.) He is also convinced that a photograph that his mother sent him "proved [she] previously had her teeth removed and later repaired with bonding." (Report at 6.) "He stated that he could not be certain that he has actually been speaking to his mother on the phone recently, suspecting the FBI has been using an imposter." (Report at 6.)

The Defendant adamantly denies having a mental illness, denies experiencing symptoms of mental illness, and will not consider any medication adjustments to treat his delusional beliefs. (Report at 6, 7) ("Mr. Wabol is not cooperative with the recommended additional treatment for his mental illness and his prognosis is guarded without ongoing psychiatric treatment).[1]

The report contained the findings of twenty-three well-recognized risk and protective factors that have been shown to correlate positively and negatively with future violent behaviors. A twenty-item checklist to assess the risk of future violent behavior in criminal and psychiatric populations, known as the HRC-20, was also reported. The Defendant received a score of 29 out of 40. Dr. Cochrane also provided findings from the MacArthur Study of Mental Disorder and Violence as they related to the Defendant. The Violence Risk Appraisal Guide, an actuarial risk assessment tool, was also used to analyze the Defendant's risk. Finally, a Risk Assessment Panel was convened to determine whether the Defendant met the criteria for commitment under § 4243. After interviewing the Defendant and discussing his case, the Panel concluded that the Defendant posed a substantial risk of bodily injury and property damage due to his mental

---

[1] The Defendant takes the current, low, dose of olanzapine because he believes it improves his sleep.

illness. "Most noteworthy was his severe mental illness with ongoing delusional beliefs, his aggressive, impulsive and threatening behavior across several settings, and his poor insight and history of treatment non-compliance." (Report at 17.)  The Panel also noted that the low dose of olanzapine the Defendant was taking would not likely prevent another manic episode, which the records indicated was closely associated with his acting out behavior. "Further, there have been no significant changes in his perceptions or mental status that would suggest he would refrain from further aggressive behavior." (Report at 17.) The Panel recommended that the Defendant be committed, where efforts would be made to develop a conditional release plan so that the Defendant could be safely returned to the community.

### C.      The Defendant's Argument That His Release Would Not Create a Substantial Risk of Injury to Another Person or Damage to Property of Another

The only evidence the Defendant presented that his release would not create a substantial risk of bodily injury to another person or serious damage of another's property due to a present mental disease or defect was his lack of violent or aggressive behavior since being incarcerated, particularly since being medicated. He also argues that his mother's fears were exaggerated due to her own paranoia, and that Dr. Cochrane's report overemphasizes certain risk factors, such as his drug and alcohol use.[2]

---

[2] The argument regarding Mary Kay Kinsella's fears do not merit a lengthy discussion by the Court. Not only did the Defendant not prove that her fears were unfounded or unreasonable, particularly given the content of the phone messages the Defendant left for her, but her subjective fears, even if reasonable, have no bearing on this Court's ruling on the issue now before it. The Defendant certainly did not prove, as he asserts, that his mother is "paranoid."

7

1.      ***Present Mental Disease or Defect***

The Defendant has not proven by a preponderance of the evidence (or by clear and convincing evidence) that he is no longer suffering from a mental disease or defect. The Defendant does not offer any expert medical opinion that he is no longer suffering from the same mental disease that he was suffering from when he committed the charged offense. The Defendant does not even appear to be challenging Dr. Cochrane's Axis I diagnosis: "Schizoaffective Disorder, Bipolar Type, Episodic, with Interepisode Remission of Symptoms." (Report at 6.) Nor does he dispute that he continues to harbor delusional thoughts about the FBI and his mother. He merely points to his improved *behavior*. However, the fact that the Defendant has not acted aggressively toward the staff since taking medication is not evidence that he is not currently suffering from a mental disease or defect. *See, e.g., United States v. Murdoch*, 98 F.3d 472, 476 (9th Cir. 1996) (holding that the defendant erroneously focused on the symptoms or side-effects of his disease, rather than the existence of the disease itself to argue that he was no longer suffering from a mental disease or defect). The defendant in *Murdoch*, like the Defendant here, was confined in a controlled environment and receiving treatment. However, "[s]imply because [the defendant] is not in a situation in which he will react dangerously does not mean that he no longer suffers from a mental disease which causes his dangerous propensities." *Id.*

2.      ***Substantial Risk of Bodily Injury or Serious Damage to Property***

The Defendant has also failed to prove that his release would not create a substantial risk of bodily injury to another person or serious damage to property. The particular delusions that the Defendant suffers under lead him to believe that the someone had put a "hit" on him and that

his mother is a body double from witness protection because the FBI harmed his real mother. This belief led him to threaten to find her (the imposter) wherever she went, hurt her, and kill her. (DE 122, Gov't Ex. 1.) His mental disease also caused him to be aggressive and hostile toward staff, which necessitated him being housed in a locked, secured unit and involuntarily medicated. In addition, there is absolutely no medical opinion in the record that the Defendant's release would not present a danger. In *Gilgert*, 314 F.3d at 516–17, the Tenth Circuit upheld a district court's finding of dangerousness. The Court stated that, not only did the trial court not clearly err in finding that the defendant had failed to meet his burden, but that it did not see "how the district court could have ruled otherwise, given the lack of any professional medical opinion in the record that [the defendant's] release would not present a danger to the community." *Id.*

The Defendant points to his compliant behavior since being incarcerated and medicated as evidence that he is not dangerous as defined in § 4243. However, not only have his delusions persisted, there is no evidence in the record that the Defendant would continue to take his medication once released or that he would remain in any type of structured and supervised environment; he does not even acknowledge his mental illness. This is problematic for the Defendant because, pursuant to the statutory scheme, this Court lacks the ability to order a conditional release at a § 4243(c) hearing. *See United States v. Jain*, 147 F.3d 892, 897 (7th Cir. 1999) ("The question posed by the § 4243(c) hearing is a simple one: can the person be released outright? If the answer is yes, that is the end of things; the statute makes no provision for continued monitoring or revocation of release."); *United States v. Stewart*, 452 F.3d 266, 274 (3d Cir. 2006) (under § 4243(e), a district court may not impose requirements on the release of a person found not guilty by reason of insanity); *United States v. Baker*, 155 F.3d 392, 396 (4th

Cir. 1998) (district court erred by conditionally releasing a person found not guilty by reason of insanity after a § 4243(c) hearing). The court must evaluate the dangerousness of the person seeking release according to his capacity to re-enter the community on his own, without the aid of judicial monitoring or a conditional release program. *See Baker*, 155 F.3d at 396.

The Defendant denies having a mental illness and has a poor history of treatment compliance. The Defendant did not identify anyone or any program outside the Butner facility that would monitor his behavior and the Defendant made no assurances that drugs or alcohol would not become a factor if he was not confined in a hospital or other facility. During his interview with Dr. Cochrane, the Defendant expressed that, if released, he would probably return to the St. Petersburg, Florida, area or go to California because he likes the climate there. If released, the Defendant would experience a drastic change from a highly controlled and supervised environment to complete independence and no guarantee that he would not likely return to pre-detention and pre-medicated behaviors.

**C.      Conclusion**

Upon hearing and consideration of all the evidence, the Court finds that the Defendant has not proven that his release would not create a substantial risk of bodily injury to another person or serious damage to property of another due to a present mental disease or defect. Therefore, he is committed to the custody of the Attorney General pursuant to § 4243(e) for release to the appropriate State official, or if no State will assume responsibility, for hospitalization for treatment in a suitable facility until the requirements of § 4243 are satisfied.

**ORDER**

The Court ORDERS that the Defendant, Christopher Wabol, is committed to the custody of the United States Attorney General. The Clerk is directed to provide a copy of this Opinion and Order to FMC Butner, attention Inmate Systems Management, at facsimile number (919) 575-4866. An official copy is to be sent to the Records Office at FMC Butner.

SO ORDERED on December 21, 2006.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION